UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

UNITED STATES OF AMERICA,

        Plaintiff,

   v.

UNION PACIFIC RAILROAD COMPANY,

        Defendant.

NO. CIV S-06-1740 FCD/KJM

MEMORANDUM AND ORDER

----oo0oo----

    This case arises out of the "Storrie Fire" that occurred on August 17, 2000 and resulted in damages to approximately 52,000 acres of National Forest System ("NFS") land in the Plumas and Lassen National Forests before it was suppressed.  This matter is before the court on four motions for partial summary judgment, three brought by defendant Union Pacific Railroad Company ("defendant" or "UP") and one brought by plaintiff United States

of America ("plaintiff").[1]  In general, the motions ask the court
to adjudicate core legal issues regarding the proper measures of
alleged natural resource damages in this action and to issue
specific orders defining the application of those measures.
Because the motions raise overlapping issues, the court considers
them jointly herein.[2]

At issue are the following key questions: (1) whether
diminution of market value of the subject real property is the
proper, over-arching measure of plaintiff's natural resource
damages in this case;[3] (2) if diminution in market value is not
the proper standard, whether plaintiff may recover as separate
and distinct injuries alleged timber damages, of over $121

---

[1]    UP's motions seek to limit plaintiff's damages recovery
and include a motion to determine the proper measure of natural
resource damages (Docket #59), the proper measure of natural
resource damages for areas subject to special land use
restrictions (Docket #70), and habitat equivalency damages
(Docket #68).  Plaintiff's motion seeks a ruling regarding a
minimum, pre-fire value of its lost timber and preclusion of UP's
affirmative defense of failure to mitigate damages based on a
theoretical post-fire salvage value for the timber (Docket #58).

[2]    Indeed, UP's motions, Docket #s 59 and 70, are
duplicative of one another in many respects.  Also, these motions
address plaintiff's alleged timber damages, and thus, plaintiff's
motion (Docket #58), raising largely the same issues, is properly
treated as a cross-motion to UP's motions (Docket #s 59 and 70).
In all, UP's motions, including its motion regarding plaintiff's
habitat equivalency damages, could have been brought as one
consolidated motion, and the court could have treated plaintiff's
motion regarding one aspect of its requested damages as a cross-
motion, in part, to UP's motions seeking to limit plaintiff's
overall damages.

[3]    In arguing in favor of this measure of damages, UP
contends that corollary rules require a finding that diminution
in market value and cost of restoration are "alternative"
measures not additive ones, and the "lesser of" rule limits any
natural resource damages to the lesser of diminution in market
value *or* cost of restoration.

million, reforestation[4] costs, between $24 and $33 million, and loss of use of non-timber forest services, including loss of habitat and environmental services, during the period of regrowth (the so-called "habitat equivalency" damages), of approximately $13 million; (3) as to plaintiff's alleged timber damages, whether such damages are recoverable for burned NFS lands located on "deferred" or "offbase" lands under the "Quincy Library Group Act" or located in designated "Wilderness" areas, when certain legal restrictions preclude commercial logging of these lands; (4) if such an award of timber damages is legally permissible, whether defendant is entitled to an offset of such damages based upon the full administrative costs of any such theoretical sale of the timber and for the theoretical salvage value of the timber; (5) as to plaintiff's reforestation costs, whether said costs are unreasonable or too speculative to serve as a basis for a damages award; and (6) as to plaintiff's habitat equivalency damages, whether said damages are duplicative or unauthorized and thus excludable from any damages award.

For the reasons set forth below, defendant's motions are DENIED and plaintiff's motion is GRANTED in part and DENIED in part.[5]  The court finds that diminution in market value is not the proper measure of damages in this case.  Plaintiff may

---

[4]     The measure of "restoration" used by plaintiff in the case of the Storrie Fire is "reforestation," or replanting of the forest, in areas severely damaged by the fire.  For purposes of this order, the terms restoration and reforestation are used interchangeably.

[5]     Because oral argument will not be of material assistance, the court orders these matters submitted on the briefs.  E.D. Cal. L.R. 78-230(h).

recover damages for its separate injuries to the trees, to the
soil and pre-merchantable timber, and its loss of use of habitat
and environmental services during the period of forest regrowth.
Defendant will not be permitted to argue at trial that
plaintiff's requested timber damages, which amount is in dispute,
are inflated due to a failure to consider certain administrative
costs, and it will not be permitted an offset, pursuant to its
affirmative defense of failure to mitigate damages, based on the
theoretical salvage value of the timber.  Plaintiff's
reforestation costs are recoverable, in addition to the other
requested damages, and are not unreasonable or too speculative.
And finally, plaintiff's habitat equivalency damages are legally
permissible and separately compensable from the other requested
damages.

### BACKGROUND[6]

The Storrie Fire ignited on August 17, 2000 on NFS lands in
Plumas County, California.  (T-RUF ¶ 1.)[7]  As addressed in
plaintiff's separate motion for summary adjudication on liability
issues, plaintiff contends a UP work crew ignited the fire while
repairing a rail at the origin area of the Storrie Fire, and UP
and its crew breached the standard of care in conducting the

---

[6]    Unless otherwise noted, the facts recited herein are
undisputed.  As reflected in the parties' various responses to
each other's statements of undisputed facts and additional
undisputed facts, there are a number of factual disputes between
them.  However, these disputes are not material to resolution of
the motions, which raise solely legal issues pertaining to the
appropriate measures of damages in this case, and thus, the court
does not recount those facts herein.

[7]    "T-RUF" refers to UP's response to plaintiff's
statement of undisputed facts filed in support of its motion for
partial summary judgment re: timber damages (Docket #82).

repair and in failing to monitor and suppress the fire before
leaving the scene.[8]   Plaintiff asserts it sustained a range of
damages as a result of the fire, including fire suppression
costs, resource damages and rehabilitation costs.   The latter two
types of damages are the subject of the instant motions.[9]

The Storrie Fire area encompassed over 51,000 acres of NFS
lands, with trees destroyed on approximately 21,000 acres in the
Plumas and Lassen National Forests.   (NR-RAF ¶ 1; NR-RUF ¶ 1.)[10]
Most of the NFS trees killed in the Storrie Fire, or likely to
die because of the fire damage, were located on NFS lands
designated as "deferred" or "offbase" for purposes of the Herger-
Feinstein Quincy Library Group Forest Recovery Act of 1998
("Quincy Library Group Act") (sometimes referred to herein as
"QLG offbase lands").   (T-RUF ¶ 3.)   Trees were also destroyed on
another portion of the land damaged in the fire known as the
"Bucks Lake Wilderness," designated as "Wilderness" under the
California Wilderness Act of 1984 and protected under the federal

---

[8]    In light of defendant's Notice of Concession of
Liability, filed Jan. 31, 2008 (Docket #98), the court GRANTS
plaintiff's motion on liability issues (Docket #64).   As conceded
by plaintiff, the reasonableness of and plaintiff's entitlement
to the amount of the fire suppression costs as claimed will be
determined at trial.   (See Docket #88, at 7.)

[9]    The motions do not address other contested measures of
damage, such as fire suppression costs, claimed by plaintiff in
the amount of more than $22 million.

[10]    "NR-RAF" refers to UP's corrected response to
plaintiff's additional facts filed in support of plaintiff's
opposition to UP's motion for partial summary judgment re:
natural resource damages (Docket #97-2); "NR-RUF" refers to UP's
response to plaintiff's opposition to UP's statement of
undisputed facts filed in support of UP's motion for partial
summary judgment re: natural resource damages (Docket #92-2).

Wilderness Act of 1964.  (SA-RUF ¶s 20-21.)[11]  Also damaged in

the fire were trees located on areas designated General Forest

areas.  (SA-RUF ¶ 18.)  Overall, less than 1% of the NFS lands

within the Storrie Fire perimeter were designated forest land

that was unsuitable for timber production.  (SA-RUF ¶ 17.)[12]

Plaintiff maintains that the Storrie Fire was predominately

a moderate to high intensity burn.  As a high intensity burn,

plaintiff contends, the fire burned the soil cover so the soil

itself eroded, and the needles burned off the trees so that there

will not be any future duff to become soil.  (NR-RAF ¶s 8, 9,

10.)  In addition to this damage, plaintiff asserts the fire also

had a major impact on wildlife habitats and the environment,

destroying, among other areas, vast acres of spotted owl habitat

and carnivore habitat, as well as an uncounted number of animals.

---

[11]   "SA-RUF" refers to UP's response to plaintiff's opposition to UP's statement of undisputed facts filed in support of its motion for partial summary judgment re: special land use restrictions (Docket #94-2.)

[12]   In its motions, UP, through its expert Kenneth Stumpf's declaration, calculates the relevant acreage and percentages of land in these areas.  According to UP, the QLG offbase areas comprise about 34,880 acres, or about 68% of the federal lands within the Storrie Fire perimeter; Bucks Lake Wilderness areas comprise about 6,489 acres, or about 13% of the federal lands within the Storrie Fire perimeter; and General Forest areas comprise about 9,261 acres, or about 18% of the federal lands within the Storrie Fire perimeter.  (SA-RUF ¶s 15, 16, 18.) Plaintiff objects to these calculations and moves to strike Stumpf's declaration under Fed. R. Civ. P. 37 for failure to disclose these calculations in his expert report and/or deposition.  The court need not rule on plaintiff's objections and motion to strike (Docket #79) since the precise calculations for these areas of land are not pertinent to resolution of the legal issues presented by these motions.  For purposes of this motion, plaintiff concedes the above described facts, which are necessary to determination of the motions.  Plaintiff may later renew, at the appropriate time, its objections to Stumpf's calculations.

(NR-RAF ¶s 12-17.)  The forests' use for recreation and scenic enjoyment was also sorely impacted, plaintiff asserts, including Highway 70 which is designated a "scenic byway" and the Pacific Crest Trial.  (NR-RAF ¶ 18.)[13]

Since 1999 and to the present, the Quincy Library Group Act prohibited the Forest Service from selling the timber on the QLG offbase lands.  The Act likewise prohibited the Forest Service, following the fire, from conducting a salvage sale of the burned trees located on the QLG offbase lands.  (T-RUF ¶s 4, 9.)  Had the trees on these lands not been wholly destroyed by the fire, plaintiff could have harvested the trees over time, after the expiration of the Quincy Library Group Act.[14]  (T-RUF ¶s 8, 9.) Similarly, no logging or reforestation was allowed in the Bucks Lake Wilderness, at the time of the fire, and no logging or

_____

[13]  UP disputes these facts, arguing primarily that they are "immaterial" to resolution of the motion.  The court agrees that it is not necessary to resolve the parties' disputes on these issues in rendering a decision on the instant motions. However, the court recounts plaintiff's position on these issues to provide context to the discussion below regarding plaintiff's claims for reforestation costs and habitat equivalency damages. Ultimately, the merits of plaintiff's contentions will be evaluated by the jury in assessing the amount of damages to award.

[14]  The Quincy Library Group Act was enacted in 1998 by Congress following an agreement by a coalition of representatives from the timber industry, fisheries, environmental groups, the federal government and local communities.  16 U.S.C. § 2104, Historical and Statutory Notes.  The Act established a pilot project for five years on lands in the Pulmas, Lassen, and Tahoe National Forests to evaluate various resource management practices.  The Act prohibited all timber harvesting activities, including timber salvage sales, on areas designated as deferred or offbase.  16 U.S.C. § 2104, Historical and Statutory Notes (c)(4).  At the time of the fire, the Act was scheduled to expire in 2004, but in 2003, Congress extended the Act through 2009 and thereafter on December 26, 2007, Congress extended the Act to September 30, 2012.  (See UP's Req. for Jud. Not., filed Jan. 31, 2008 [Docket #99].)

reforestation of the area is permitted today.  (SA-RUF ¶s 20,
21.)  The General Forest areas are lands where commercial logging
may occur subject to other legal restrictions, such as
environmental assessment requirements.  (UP's MSJ re: Areas
Subject to Special Land Use Restrictions [Docket #70] at 1 n.3.)

Plaintiff contends the Storrie Fire destroyed NFS timber
that had a total pre-fire timber value of $121,916,774.  However,
plaintiff seeks by its motion a finding that, at a minimum, the
pre-fire timber value is $79,291,175, representing the value
plaintiff contends UP's expert conceded was the pre-fire value of
the destroyed timber.  Defendant disputes that its timber
appraisal expert, James Fleming, made such a concession; rather,
defendant maintains that Mr. Fleming proposed this figure as a
*hypothetical* pre-fire value, calculated as if the trees were on
private land and were able to be sold without NFS restrictions.
(T-RUF ¶ 2.)

As to the NFS timber that was not located on QLG offbase
lands, the Forest Service conducted post-fire salvage sales,
recovering $335,616.  (T-RUF ¶ 7.)  Defendant contends a post-
fire salvage sale of the burned timber on the QLG offbase lands,
had federal law permitted it, would have generated $73,592,040.
Therefore, defendant claims, if at all, plaintiff incurred only
$5,699,135 in net lost timber value ($79,291,175 minus
$73,592,040).  (T-RUF ¶ 5-6.)[15]

---

[15]    UP filed certain objections to the evidence submitted
by plaintiff in opposition to UP's motions (Docket #92-4).  The
court does not rule on said objections as the underlying evidence
is not pertinent to resolution of the legal issues presented on
(continued...)

**STANDARD**

The Federal Rules of Civil Procedure provide for summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). One of the principal purposes of the rule is to dispose of factually unsupported claims or defenses. Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. See Celotex, 477 U.S. at 323-24. If the moving party does not bear the burden of proof at trial, he or she may discharge his burden of showing that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the non-moving party's case." Celotex, 477 U.S. at 325. Once the moving party meets the requirements of Rule 56 by showing there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion, who "must set forth specific facts showing that there

---

[15](...continued)
these motions. UP may renew, at the appropriate time, its objections to the subject evidence.

is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).  Genuine factual issues must exist that "can be resolved only by a finder of fact, because they may reasonably be resolved in favor of either party." <u>Id.</u> at 250.

In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. <u>See</u> <u>T.W. Elec. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630-31 (9th Cir. 1987) (citing <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)).  The evidence presented by the parties must be admissible.  Fed. R. Civ. P. 56(e).  Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. <u>See</u> <u>Falls Riverway Realty, Inc. v. City of Niagara Falls</u>, 754 F.2d 49, 57 (2d Cir. 1985); <u>Thornhill Publ'g Co., Inc. v. GTE Corp.</u>, 594 F.2d 730, 738 (9th Cir. 1979).

**ANALYSIS**

California law applies on plaintiff's damages claims in this action (except on plaintiff's claim for interest and penalties under 31 U.S.C. § 3717). <u>United States v. California</u>, 655 F.2d 914, 917-20 (9th Cir. 1980) (in forest fire recovery cases brought by the United States, federal courts will "borrow[] state law to fashion the federal rule of decision").  As this court has held:  "It is appropriate for the United States to rely upon the provisions of the [California] Health and Safety Code [§§ 13007-13009.1] as a basis for a claim to recover damages to National Forest land caused by a fire and/or to recover associated fire suppression and investigation costs." <u>United States v. Southern Cal. Edison Co.</u>, 413 F. Supp. 2d 1101, 1129 (E.D. Cal. 2006).

1    **1.   <u>Diminution in Market Value</u>**

2    UP contends that under California law the measure of damage

3    for negligent injury to real property is the difference between

4    the value of the property before and after the injury.  This

5    measure, UP asserts, is the "favored, usual measure" of injury to

6    timber by fire because it offers several advantages over

7    alternate yardsticks, including a comparatively easy and certain

8    assessment of pre- and post-fire market value, the consideration

9    of the fire's benefits, and avoidance of inappropriate double

10   recovery for overlapping elements of damage.  <u>See</u> <u>Santa Barbara</u>

11   <u>Pistachio Ranch v. Chowchilla Water Dist.</u>, 88 Cal. App. 4th 439,

12   446 (2001); <u>Heninger v. Dunn</u>, 101 Cal. App. 3d 858, 862 (1980);

13   <u>Mozzetti v. City of Brisbane</u>, 67 Cal. App. 3d 565, 576 (1977).

14   UP is correct that courts have recognized that "generally"

15   the measure of damages for the destruction of or injury to

16   productive trees is "the difference in the value of the land

17   before and after the destruction or injury."  <u>See e.g.</u>, <u>Santa</u>

18   <u>Barbara Pistachio Ranch</u>, 88 Cal. App. 4th at 447; <u>Heninger</u>, 101

19   Cal. App. 3d at 861-62.  However, UP fails to acknowledge that

20   these same courts also emphasize that:

21           There is no fixed rule for the measure of tort damages
             under Civil Code section 3333.  The measure that most
22           appropriately compensates the injured party for the loss
             sustained should be adopted.
23
24   <u>Santa Barbara Pistachio Ranch</u>, 88 Cal. App. 4th at 446-47; <u>see</u>

25   <u>also</u> <u>Heninger</u>, 101 Cal. App. 3d at 862 (recognizing that

26   "[d]iminution in market value . . . is not an absolute

27   limitation; several other theories are available to fix

28   appropriate compensation for the plaintiff's loss"); <u>Mozzetti</u>, 67

11

1   Cal. App. 3d at 576 (recognizing there is no fixed, inflexible
2   rule for determining the measure of damages for injury to or
3   destruction of property and whatever formula is most appropriate
4   in a particular case will be adopted).  Indeed, the general
5   measure of tort damages under California law is broadly defined;
6   California Civil Code section 3333 provides: "For the breach of
7   an obligation not arising from contract, the measure of damages,
8   except where otherwise expressly provided by this code, is the
9   amount which will compensate for all the detriment proximately
10  caused thereby, whether it could have been anticipated or not."

11      Thus, as the injured party here, plaintiff is entitled to
12  *full* compensation for *all* of its damages.  While the cases cited
13  by UP set forth general principles that may be applied if
14  appropriate to the factual circumstances of the case, they do not
15  dictate an inflexible, formulaic approach, as UP urges.  Rather,
16  this court must consider, as many courts have, the unique
17  character of the land at issue.  "Where the article or thing is
18  so unusual in character that market value cannot be predicated on
19  it, its value, or plaintiff's damages, must be ascertained in
20  some other rational way . . . ."  Zvolanek v. Bodger Seeds, 5
21  Cal. App. 2d 106, 109 (1935); see also State of Ohio v. U.S.
22  Dep't of the Interior, 880 F.2d 432, 463 (D.C. Cir. 1989)
23  ("[N]atural resources have values that are not fully captured by
24  the market system.").

25      UP cites to a number of cases addressing property damages to
26  residential or commercial real property with an available market
27  value and stating that a plaintiff is generally allowed to
28  recover either the cost of repair or the diminution in market

                                    12

1  value.  See e.g. Safeco Ins. Co. of Am. v. J&D Painting, 17 Cal.

2  App. 4th 1199 (1993); Ferraro v. So. Cal. Gas Co., 102 Cal. App.

3  3d 33 (1980); Mozzetti, 67 Cal. App. 3d at 576.  These cases,

4  however, have little or no relevance to the present case, in

5  which UP burned thousands of acres of protected government forest

6  lands for which no real estate market value exists.  Moreover, UP

7  ignores applicable California and Ninth Circuit law setting out

8  the appropriate measure of damages for fire injuries to *forest*

9  *lands.*

10       **2.   Recoverable Damages**

11       In McKay v. State of Cal., 8 Cal. App. 4th 937, 940 (1992),

12  the California court of appeal held that in light of the broad

13  statutory language of Health and Safety Code section 13007[16] and

14  "its history of liberal construction," the statute places "no

15  restrictions on the type of property damage that is compensable"

16  thereunder.  Thus, courts have not read Section 13007 as limiting

17  a plaintiff's recovery to property damage only.  See Robinson v.

18  U.S., 175 F. Supp. 2d 1215, 1221 (E.D. Cal. 2001).  Resource

19  damages, including timber damages, rehabilitation and restoration

20  costs, and environmental and habitat damages are recoverable as

21  separate injuries.  McKay, 8 Cal. App. 4th at 940 (affirming

22  judgment for both lost market value for burned land and lost

23  profits during recovery period); People v. Southern Pacific Co.,

24  139 Cal. App. 3d 627, 635 (1983) (affirming damages for the

25

26       [16]  Section 13007 provides: "Any person who personally or
     through another willfully, negligently, or in violation of law,
27  sets fire to, allows fire to be set to, or allows a fire kindled
     or attended by him to escape to, the property of another, whether
28  privately or publicly owned, is liable to the owner of such
     property for *any damages* to the property caused by the fire."

separate injuries of destruction of trees used for timber, damage to the soil, replanting costs, and expenses incurred in salvage operations); <u>Feather River Lumber Co. v. U.S.</u>, 30 F.2d 642, 644 (9th Cir. 1929) (measure of damages for destruction of merchantable timber was value of such trees, and measure of damages for young growth forest was cost of restoring land to its condition prior to fire).

More specifically, in <u>Southern Pacific Co.</u>, the owners of timberland damaged by fire filed suit against a railroad company, alleging that the fire had started on or escaped from a railroad right-of-way as a result of the railroad's negligence. 139 Cal. App. 3d at 631.  On appeal, the railroad complained that the jury instructions improperly allowed the jury to award damages for *both* the fair market value of the timber destroyed *and* the cost of restoration of the property through reforestation.  <u>Id.</u> at 635.  In finding no error, the court held that the property owners were entitled to damages for the separate injuries of destruction of trees used for timber, damage to the soil, replanting costs, and expenses incurred in salvage operations.  <u>Id.</u>  Distinguishing <u>Heninger</u>, heavily relied upon by UP herein, the court in <u>Southern Pacific Co.</u> wrote:

> [In <u>Heninger</u>] there was only one element of damage–
> the loss of trees and vegetation–and the trial court
> had denied damages because it found that the defendant's
> conduct (bulldozing a road through plaintiff's property)
> resulted in a net increase in the market value of the
> property.  The Court of Appeal, emphasizing the 'broad
> mandate' of Civil Code section 3333 to compensate for
> 'all the detriment proximately caused' by the tortious
> injury to property, held that the trial court could
> have awarded either the value of the trees and undergrowth,
> as timber or for their aesthetic qualities, or the cost
> of restoration, if reasonable and if the plaintiffs had
> 'personal reasons' for restoration.

14

> Here, there is no question but that the fire damaged
> plaintiffs' property and reduced its value.  Moreover,
> it did so not only through destruction of trees used
> for timber, but through damage to the soil.  In addition,
> respondents were required by law to replant to a certain
> minimum density, and they incurred expenses in their
> salvage operation.  These are separate injuries.

Id. at 635.  Such is also the case here.

Likewise, in McKay, the appellate court specifically rejected the contention that the owners of agricultural property who suffered damage after a controlled-burn fire spread to their property were entitled to recover damages only for the reduction in the value of their real property.  8 Cal. App. 4th at 939. Recognizing Section 13007's history of liberal construction, the court held that the statute permits recovery for any damages to the property and places no restriction on the type of property damage that is compensable.  Id. at 939-40.  The court therefore concluded that lost profits from a business connected to the property damaged by fire were compensable.  Id. at 940. Similarly, in Feather River, the Ninth Circuit held that the trial court properly admitted evidence showing what was required to make the government whole following a fire to public lands, which included the cost of restoring the land to its pre-fire condition.

In sum, the case law is clear that there is not one particular method for ascertaining plaintiff's damages in this case.  There are many separate, identifiable categories of damages potentially awardable to fully compensate plaintiff for its injuries caused by defendant's negligence.  Plaintiff may argue these different damages to the jury, and the court finds

1   that diminution in market value is not a reasonable method of

2   ascertaining the damages to the unique land at issue.  Courts

3   have recognized in similar cases, that to fully compensate the

4   government for injury to such protected forest lands, it must be

5   permitted to recover for its separate and identifiable injuries,

6   including the value of the NFS timber destroyed by the fire,

7   reforestation costs due to damage to the soil and for young

8   growth, pre-merchantable trees destroyed by the fire and damages

9   for loss of habitat and other loss of use of the burned NFS land

10  during the period of regrowth.

11       The court turns next to these specific categories of damages

12  and UP's particular challenges thereto.

13       **3.   Timber Damages**

14       As a preliminary issue, plaintiff requests that the court

15  enter partial summary judgment in its favor, finding that a

16  minimum, the NFS timber destroyed as a result of the Storrie Fire

17  had a pre-fire timber value of at least $79,291,175.  Plaintiff

18  makes this argument solely on the basis of an alleged

19  "concession" made by UP's timber appraisal expert, Mr. Fleming.

20  UP disputes that any such concession was made by Mr. Fleming

21  (T-RUF ¶s 5, 6, T-ADF ¶ 7),[17] and as such, the court cannot make

22  the requested finding in plaintiff's favor.  The amount of

23  plaintiff's timber damages is a disputed issue of fact which the

24  jury must resolve at trial.

25

26

27       [17]  "T-ADF" refers to UP's additional facts filed in
    opposition to plaintiff's motion for partial summary judgment re:
28  timber damages (Docket #82).

1    However, the court can determine on summary judgment whether
2    plaintiff is entitled to seek such damages, and if it is, whether
3    defendant is entitled to any offset thereof.   These are issues of
4    law.

5    As to the first issue, defendant contends that plaintiff may
6    not recover damages for the value of the trees located on the QLG
7    offbase and Bucks Lake Wilderness lands because commercial
8    logging of those lands is not permitted by law.   Such logging is
9    prohibited on the QLG offbase lands through September 2012, and
10   is prohibited indefinitely on the Wilderness lands.   Under the
11   case law discussed above, however, plaintiff is entitled to
12   recover all of its timber damages for mature timber destroyed
13   because of the Storrie Fire, regardless of whether that timber
14   was located on General Forest lands, on QLG offbase lands or on
15   the Bucks Lake Wilderness lands. <u>See</u> <u>Southern Pacific Co.</u>, 139
16   Cal. App. 3d at 635; <u>Feather River</u>, 30 F.2d at 644.

17   Contrary to defendant's argument, said damages to the QLG
18   offbase lands are not speculative.   When the Storrie Fire
19   occurred in August 2000, the Quincy Library Group Act was set to
20   expire in 2004.   Had the fire not destroyed the trees within the
21   deferred and offbase areas, the trees would have been
22   commercially available for harvesting within a few years, and
23   plaintiff could have recovered their timber market value.   <u>See</u>
24   <u>Safeco Ins. Co. v. J&D Painting</u>, 17 Cal. App. 4th 1199, 1202
25   (1993) (recognizing that property damage is properly calculated
26   based on the condition of the property *at the time of the*
27   *injury*).   Instead, as a result of the damage caused by the
28   Storrie Fire and the subsequent decay of the burned trees, these

1   trees are dead or dying and no longer have any viable timber

2   value.  (T-RUF ¶ 8.)  In other words, but for the Storrie Fire's

3   destruction of the trees, the trees' timber value would have

4   remained "banked" for future use, and the Forest Service

5   potentially could have realized the trees' green timber value by

6   harvesting the trees over time in future years, after the

7   expiration of the Act.  That the Act has subsequently, post-fire,

8   been extended is of no consequence to the issue presented here

9   because at the relevant time in 2000, the Act had a definite

10  expiration date.

11      UP's reliance on United States v. Denver & Rio Grande W. RR

12  Co., 547 F.2d 1101 (10th Cir. 1977), to argue that in areas where

13  commercial logging is not allowed the reasonable cost of

14  reforestation is the proper measure of damages, is misplaced.

15  Denver & Rio Grande involved 55 acres of "non-commercial

16  forest land" consisting of "nearly precipitous canyon walls,"

17  with 50% of the burned surface consisting of "rock outcroppings,"

18  and for which no timber-cutting or grazing permits had ever

19  been issued.  Id. at 1104-05.  There was no known market value

20  for the burned tract either before or after the fire.  Id. at

21  1105.  Rather than supporting its claim for 55 acres of timber

22  damages with expert testimony, the government instead relied on a

23  generic Bureau of Land Management formula.  Id. at 1105.  Under

24  such circumstances, the court found that the appropriate measure

25  of damages was the reasonable cost of restoration of the land.

26      In contrast, here, plaintiff's timber damages of

27  $121,916,774 are supported by detailed expert analysis of actual

28

18

timber values.  (SA-RAF ¶ 10.)[18]  For example, plaintiff's
experts did not include immature trees without commercial value
in their timber damages assessment; instead, plaintiff seeks
reforestation costs for the destruction of these trees.  It is
also undisputed that less than 1% of the NFS lands within the
Storrie Fire perimeter consisted of non-forest land not suitable
for timber production.  Such lands were not, by definition,
included in plaintiff's request for timber damages.  (SA-RAF ¶
11.)  Plaintiff also deducted from its estimated timber damages
any monies recovered in its post-fire salvage sales on non- QLG
offbase and Wilderness lands (some $335,616).

Additionally, the illogic of UP's argument is starkly
revealed when one considers, in particular, the Bucks Lake
Wilderness area.  UP contends that since this area may never be
logged or reforested, plaintiff should not be awarded damages
based on pre-fire timber valuation or reforestation.  Rather, UP
contends that plaintiff may only recover damages based on injury
to this area if it can present "competent evidence of a proper
valuation" that is "not speculative, is logically supported, and
consistent with law."  (UP's MSJ re: Areas Subject to Special
Land Use Restrictions [Docket #70] at 12 n. 19.)  However,
according to UP, plaintiff's experts have not presented such
evidence. (Id.)  Essentially, UP contends that plaintiff has no
quantifiable recovery for the destruction of this area--under
UP's view, UP effectively had a free pass to burn this land.

_____

[18]  "SA-RAF" refers to UP's response to plaintiff's
additional facts in opposition to UP's motion for partial summary
judgment re: natural resource damages for areas subject to
special land use restrictions (Docket #94-3).

1    UP's argument wholly ignores that the Wilderness areas are

2    national treasures created by Congress "to secure for the

3    American people of present and future generations the benefits of

4    an enduring resource of wilderness," and they are to "be

5    administered for the use and enjoyment of the American people in

6    such manner as will leave them unimpaired for future use and

7    enjoyment as wilderness."  16 U.S.C. § 1131(a). "Congress thereby

8    expressed support for the principle that wilderness has value to

9    society that requires conservation and preservation." The

10   Wilderness Society v. United States Fish & Wildlife Serv., 353

11   F.3d 1051, 1055 (9th Cir. 2003) (en banc).  In such

12   circumstances, plaintiff may recover damages for the timber

13   burned in the Wilderness areas.  Courts have recognized that:

> [I]f [the] restoration of the land to a reasonable
> approximation of its former condition is impossible
> or impracticable, the landowner may recover the value
> of the trees or shrubbery, *either as timber or for their*
> *aesthetic qualities*, again without regard to the diminution
> in the value of the land.

Hassoldt v. Patrick Media Group, Inc., 84 Cal. App. 4th 153, 168

(2000) (emphasis added) (quoting Heninger, 101 Cal. App. 3d at

865 (1980)).[19]

---

[19]   For the same reasons, UP's argument regarding the
"Roadless Rule," a United States Forest Service regulation
generally prohibiting logging in inventoried roadless areas, some
of which are within the QLG offbase lands, is also unavailing.
See 36 C.F.R. § 294.10 *et seq.*  While the Roadless Rule may
preclude logging within some of the QLG offbase lands beyond the
expiration of the Quincy Library Group Act, such prohibition does
not prevent plaintiff from seeking timber damages for the same
reasons plaintiff may recover damages based on injury to the
Bucks Lake Wilderness area.  Moreover, the court notes that the
Roadless Rule has been subjected to voluminous litigation, all of
which render uncertain its present viability and applicability to
this case in the first instance.  (See Pl.'s Reply on MSJ re:
(continued...)

Destroyed timber values are a relevant means to capture at least part of the lost value of the burned lands because there is no available real property market value by which to determine the pre- and post-fire value of thousands of acres of NFS lands that may not be sold and are held in trust for the benefit of current and future generations of Americans.  Congress has elected to preserve certain NFS lands in an unharvested state, either temporarily as in the case of QLG offbase lands, or more permanently as with the Wilderness areas or areas subject to the Roadless Rule.  These decisions reflect federal policy that such NFS lands have a higher public worth than simply the present value of their timber.  <u>See e.g.</u> 16 U.S.C. §§ 475, 528 (stating Congress' policy that NFS lands be administered for a variety of purposes including outdoor recreation, range, watershed, wildlife, and fish purposes, in addition to furnishing a continuous supply of timber); 16 U.S.C. § 2104 (detailing the wide range of purposes for which the Forest Service protects National Forests); 16 U.S.C. § 1131(a) (purpose of Wilderness designation is to secure for future generations an enduring resource of wilderness).

Accordingly, the court finds plaintiff is entitled to recover its timber damages for NFS timber destroyed by the Storrie Fire, including for NFS timber located on the QLG offbase lands and lands within the Bucks Lake Wilderness.

-----

[19](...continued)
Timber Damages [Docket #91] at 7 n. 3.)

1    UP asserts that if such damages are permitted by the court,
2    it should be permitted to argue to the jury that plaintiff's
3    damages calculation is inflated, as it does not account for the
4    full administrative costs that the government would have incurred
5    in marketing unburnt timber at the prices it claims, including
6    environmental assessment costs and road building costs.  (NR-RUF
7    ¶s 8-10.)  UP is incorrect.  The harm in this case was caused by
8    UP's *now* admitted negligence (see supra n. 8); negligence which
9    essentially created a "forced sale" by plaintiff of the trees,
10   and thus, deduction for so-called "administrative" costs is not
11   appropriate.  See Roark v. Musgrave, 41 Ill. App. 3d 1008, 1014
12   (Ill. App. Ct. 1976) ("[T]o limit his recovery to the commercial
13   value of the timber taken would have been to reduce the function
14   of the trial court to that of supervisor of a forced sale,
15   against the will of the plaintiff and without regard to the
16   substantial injury done to the land.").  Therefore, to compensate
17   plaintiff for the harm to the trees as a result of UP's
18   negligence, damages must be awarded for all of the trees that
19   were killed or damaged by the Storrie Fire, and not then reduced
20   by fictitious, unrealized income from a hypothetical sale of the
21   timber.  Defendant will not be permitted to ask the jury to make
22   these deductions to plaintiff's claimed timber damages.
23   Nevertheless, the court notes that plaintiff has indicated that
24   its damage appraisers deducted the actual anticipated logging
25   costs from the value of the timber claimed.  (Pl.'s Opp'n to UP's
26   MSJ re: Natural Resource Damages [Docket #76] at 19 n. 10.)
27       In a similar argument, defendant contends it is entitled to
28   an offset of plaintiff's timber damages based upon the amount UP

contends the Forest Service could have obtained in a theoretical
post-fire salvage sale of the timber on the QLG offbase lands.
Specifically, defendant seeks an offset of $73,592,040, claiming
that the Forest Service could have recovered this amount in such
a sale.  Plaintiff contends that an offset is not permitted
because a salvage sale is barred by the Quincy Library Group Act
and would have been illegal thereunder.  UP agrees that the Act
prohibited a post-fire salvage sale, but argues that it likewise
precluded a sale of the timber pre-fire, and thus, if the
government is permitted damages based in part on the *theoretical*
pre-fire, sale value of the timber on these lands, UP should also
receive a corresponding offset to those damages based on a
theoretical post-fire salvage sale.

UP's argument misapprehends the relevant inquiry.  The Ninth
Circuit has specifically held salvage value is a question of
mitigation *after* actual damages have been ascertained and then
only for amounts that *were* realized or *could have been* realized.
United States v. Hult, 319 F.2d 47, 48 (9th Cir. 1963).  In Hult,
the United States brought an action for damages for trespass on
timber lands and appealed an unsatisfactory judgment.  The Ninth
Circuit, applying Oregon law which provided for double damages
for trespass, held:

> The amount of the judgment shall be determined by first
> doubling the amount of actual damages suffered as the
> result of the trespass, and deducting from such doubled
> damages, *in mitigation thereof,* allowance for such salvage
> as the United States, by its own diligence, *realized or
> could have realized*.  The fact, *if it is a fact*, that the
> United States could have salvaged all or most of the cut
> timber at a value equaling or exceeding the stumpage value
> of such timber, is without relevance in determining the
> amount of actual damages resulting from the trespass, *but
> is to be considered only with regard to the question of*

23

1    *mitigation after actual damages have been ascertained*
2    and doubled.

Id. (Emphasis added.)

3         Thus, there is no "corresponding" rule, as suggested by UP,
4    since the assessment of plaintiff's actual damages, and the rules
5    governing that issue, are a separate inquiry from the assessment
6    of plaintiff's duty to mitigate its damages after the commission
7    of the tort.  Under the doctrine of avoidable consequences (or
8    mitigation of damages), the person injured by another's wrongful
9    conduct may not recover continuing damages "that the injured
10   person could have avoided by reasonable effort or expenditure."
11   State Dep't of Health Servs. v. Sup. Ct., 31 Cal. 4th 1026, 1043
12   (2003).  In Hult, the court made clear that allowance for salvage
13   value is permitted only for monies the government actually
14   realized or could have realized.  Thus, UP is entitled to an
15   offset of damages only for the salvage value realized by
16   plaintiff for its salvage sale with respect to timber not located
17   on the QLG offbase lands (plaintiff concedes on the motion a
18   salvage value for this timber of $335,616).  With respect to the
19   QLG offbase lands, however, plaintiff *could not* realize a salvage
20   value for that timber because such a sale was prohibited by law.
21   16 U.S.C. § 2104, Historical and Statutory Notes, (c)(4).  UP is
22   accordingly not entitled to an offset of these damages based on a
23   theoretical post-fire salvage sale of the burned timber on the
24   QLG offbase lands.[20]

---

[20]    Defendant seeks this offset via its affirmative defense
of failure to mitigate damages.  At times in its papers,
plaintiff asks the court to "strike" this defense.  UP opposed
(continued...)

24

Plaintiff's citation to <u>People v. New York Cent. & H.R.R.</u>
<u>Co.</u>, 213 N.Y. 136 (1914), to argue the contrary, is inapposite.
Not only is the decision of no precedential value, it is wholly
distinguishable on the facts.  There, the initial appellate court
affirmed the trial court's award of damages based upon the value
of the green trees before the fire, and without any reduction for
salvage value because the trees could not be salvage logged.  161
A.D. 322, 326-27 (N.Y. 1914).  On appeal, the New York Court of
Appeals (New York's highest court) reversed.  213 N.Y. 136
(1914).  However, it expressly did so because the parties
*stipulated* that the measure of damages for negligently causing
the burning of a state forest preserve was the difference in
market value of the forest lands before and after the burning.
<u>Id.</u> at 139-40.  Moreover, the state in that case had not set up a
valuation method for such damages.  <u>Id.</u>  The court held that the
proper measure of damages as stipulated by the parties was not
changed by the constitutional inhibition on the sale of the land.
<u>Id.</u>

Unlike <u>New York Cent</u>, here, there is no stipulation as to
the proper measure of damages and California law specifically
provides for the recovery of separate categories of damages.  <u>See</u>
<u>e.g.</u> <u>Southern Pacific Co.</u>, 139 Cal. App. 3d at 627.  Moreover,

---

[20](...continued)
said request, arguing it is procedurally improper to strike a
defense on a motion for summary judgment; plaintiff's motion,
despite the occasional improper reference to a motion to strike,
is correctly treated as a motion for partial summary judgment as
to this defense; such a motion is proper under Fed. R. Civ. P.
56, as plaintiff seeks a finding that as a matter of law, UP
cannot assert its defense on this legal ground.

Ninth Circuit law provides for the offset of salvage values only that were realized or could have been realized. <u>Hult</u>, 319 F.2d at 48.

Therefore, plaintiff's motion as to UP's affirmative defense of failure to mitigate damages based on a theoretical post-fire salvage sale of the timber on the QLG offbase lands is granted, as the defense is not maintainable on this ground as a matter of law.[21] As such, the court likewise grants plaintiff's motion to exclude at trial Mr. Fleming's testimony directed to this issue. Because UP's defense on this theory is precluded, Mr. Fleming's testimony concerning a purported offset of $73 million, from a theoretical post-fire salvage sale that was never conducted and for which there was and is no legal basis, must be precluded as well.[22]

_____

[21]   To the extent UP has any other bases to press its affirmative defense of failure to mitigate damages against plaintiff, the court makes no findings therein.  The court's findings are limited only to the issues raised by the parties on the instant motions.

[22]   To the extent the parties have made other objections and motions to strike each other's experts' testimony in this case, including Mr. Fleming and plaintiff's expert, David Stone, the court does not reach those issues.  Challenges to an expert's methodology and reliability are properly considered at the time of trial by motions in limine.  (Pre-trial Sch. Order, filed Oct. 26, 2006); E.D. Cal. L.R. 16-285(a)(3).  Challenges to an expert's substantive opinions are the proper subject of cross-examination; such issues are not appropriate for resolution on summary judgment.  For example, plaintiff's objections to alleged "deficiencies" in Mr. Fleming's opinions on the estimated reforestation costs, (<u>see</u> plaintiff's opposition to UP's motion for summary judgment re: natural resource damages [Docket #76] at 15-16), are the proper subjects of either a motion in limine or cross-examination.

1        **4.    Reforestation Costs**

2        As set forth above, to "fully" compensate plaintiff for

3 defendant's negligent conduct, plaintiff may seek damages for

4 injuries other than to the timber, including harm to the soil,

5 destruction of young growth, pre-merchantable timber, and

6 destruction of wildlife, habitat, recreation use, views, etc.

7 See e.g. Southern Pacific Co., 139 Cal. App. 3d at 635; Feather

8 River, 30 F.2d at 644; Spokane Int'l RR v. U.S., 72 F.3d 440, 443

9 (9th Cir. 1934).  The latter injuries are discussed below

10 regarding plaintiff's request for habitat equivalency damages and

11 defendant's challenges thereto.  With respect to plaintiff's

12 claimed reforestation costs, plaintiff proffers evidence of the

13 fire's severe impact on the soil itself and the destruction of

14 pre-merchantable timber caused by the fire (NR-RAF ¶s 8, 9, 10),

15 damages which are separate and apart from the injury to the

16 merchantable trees.  The damage to the soil, according to

17 plaintiff, may take hundreds of years to rebuild, if ever.

18 (NR-RAF ¶ 11.)  Plaintiff calculates its expected future costs,

19 if all the areas in which trees were killed were replanted, at

20 $32,608,739, or if a more conservative approach is taken and

21 initial efforts are directed only to areas that suffered moderate

22 and high intensity burns, at $23,916,190.  (NR-RUF ¶ 3.)[23]  These

23 damages are legally recoverable, for the separate injury to the

24 soil and pre-merchantable timber, under the authorities discussed

25 above.

26 

27        [23]    Because federal law precludes the Forest Service from
undertaking reforestation efforts on Wilderness lands, plaintiff
did not include any Wilderness lands in its calculations of
28 reforestation damages.

27

1    Nonetheless, UP argues plaintiff's reforestation costs are

2  unreasonable and too speculative to form the basis of a damages

3  award.  As to the first issue, UP is correct that only reasonable

4  reforestation costs are appropriate.  Heninger, 101 Cal. App. 3d

5  at 865.  "Proposed replacement costs may be unreasonable or

6  excessive in relation to the damage inflicted on the land . . .

7  or the value prior to trespass."  Id.  However, UP's argument

8  fails as this court has determined that diminution in market

9  value is not the proper measure of damages in this case.  Rather,

10 here, plaintiff may seek a damages award, which includes an

11 alleged $121 million in damages to the destroyed timber.  Because

12 plaintiff may argue these damages to the jury, the court cannot

13 find on summary judgment, that as a matter of law, plaintiff's

14 alleged reforestation costs, of between $24 and $33 million, are

15 excessive in relation to the alleged damage inflicted on the land

16 at issue.

17    UP alternatively contends that plaintiff's reforestation

18 damages should be precluded as too speculative.  Specifically, UP

19 asserts plaintiff cannot show it is "highly probable" it will

20 actually replant the areas of the forest for which it seeks

21 reforestation costs.  Yet, UP acknowledges in the seven years

22 since the fire, plaintiff has replanted approximately 300 acres

23 of forest at a cost of $254,000.  (NR-RUF ¶ 29-31.)  Further,

24 plaintiff submits evidence of its detailed reforestation plans

25 and the costs therefor.  (NR-RUF ¶ 3.)[24]  Based on plaintiff's

26

27    [24]  Plaintiff explains that it has not replanted more of
   the subject area to date because there has not been a budget to
28                                              (continued...)

proffered evidence, the court cannot find, as a matter of law, that these damages are too speculative.

Finally, the court notes that contrary to the cases relied upon by UP, wherein the restoration costs involved the replacement of destroyed trees with "identical or substantially similar trees," and the "achievement of a reasonable approximation of the land's former condition,"[25] here, much of the devastated areas involved old growth forests, designated Wilderness and trees that were hundreds of years old.  The reforestation in this case will involve only seedlings.  Thus, the habitat equivalency damages, sought by plaintiff, seek to quantify the harm to the habitat and environment and the lengthy process it will take to rebuild the forests to their former condition.

**5.   Habitat Equivalency Damages**

Finally, UP requests partial summary judgment on plaintiff's claim for habitat equivalency damages, arguing such damages are duplicative and unauthorized.  As previously discussed, plaintiff is entitled to seek full compensation for the separate and identifiable injuries it has suffered.  Cal. Civ. Code § 3333; See e.g. Southern Pacific Co., 139 Cal. App. 3d at 635 (affirming damages for separate injuries from forest fire).

---

[24](...continued) accomplish that goal.  (Pl.'s Opp'n to UP's MSJ re: Natural Resource Damages [Docket #76] at 21-22.)

[25]    (UP's MSJ re: Natural Resource Damages [Docket #61] at 10:20-25, citing Heninger, 101 Cal. App. 3d at 865.)

Plaintiff proffers evidence that habitat equivalency damages provide compensation for loss of the non-timber forest services that resulted from the fire.[26]  These services include aesthetic/scenic use, wildlife habitat, and recreational use. (HE-RUF ¶ 1.)[27]  Specifically, plaintiff's experts estimate the fire burned more than 1,600 acres of spotted owl habitat, 12,000 acres of carnivore habitat, 9,000 acres of Old Growth forests (impacting bald eagles, goshawks, and pine martens), and impacted amphibians and fish by silt run-offs into streams.  The forest's use for scenic and recreational enjoyment was also impacted, particularly along Highway 70, a "scenic byway," and the Pacific Crest Trail.  (NR-RAF ¶s 12-17; NR-RAF ¶ 18.)  Plaintiff estimates the damage to wildlife habitat and public enjoyment of the forest is $13,236,000.  (HE-RUF ¶ 11.)  These habitat equivalency damages are distinct from both the timber damages for the timber destroyed as a result of the fire and the reforestation damages for the costs plaintiff will incur in replanting areas of the forest damaged by the fire.

UP also contends there is no federal or California statute authorizing the award of habitat equivalency damages.

---

[26]    Plaintiff does not agree with the characterization of these damages as "habitat equivalency *damages*."  Plaintiff contends "habitat equivalency analysis" is the method employed by its experts of calculating a portion of plaintiff's damages, not a separate category of damages.  At core, however, plaintiff seeks damages for injuries that are distinct from loss of timber and reforestation costs.  The label used to characterize these damages is of no consequence.

[27]    "HE-RUF" refers to plaintiff's response to UP's statement of undisputed facts filed in support of its motion for partial summary judgment re: habitat equivalency damages (Docket #77-1).

Specifically, UP points to federal statutes that expressly allow for these types of damages and contends that no such federal legislation is applicable to this case.  See, e.g., Park System Resources Protection Act, 16 U.S.C. § 19jj(b)(1)(A)-(B); National Marine Sanctuaries Act, 16 U.S.C. § 1432(6)(A)(I)-(ii); Oil Pollution Act, 33 U.S. C. § 2706(d)(1)(A)-(C); Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. § 9607(a)(4)(c).  In sum, UP asserts that because there is no express authorization for habitat equivalency damages, plaintiff is precluded from seeking such damages.

As UP acknowledges, however, a plaintiff suing for negligence is entitled to "the amount which will compensate [it] for all the detriment proximately caused [by the defendant], whether [the harm] could have been anticipated or not."  Cal. Civ. Code § 3333; see also Cal. Health & Safety Code § 13007 (permitting recovery for "any damages to property caused by the fire") (emphasis added); McKay, 8 Cal. App. 4th at 940 (affirming damages for lost market value of burned land and lost profits during recovery period).  Moreover, none of the statutes cited by UP precludes plaintiff's recovery of habitat equivalency damages. Absent a statutory prohibition, plaintiff is permitted to seek full compensation for losses suffered as a result of the fire, including habitat equivalency damages.  See, e.g., Southern Pacific Co., 139 Cal. App. 3d at 635.

31

**CONCLUSION**

For the foregoing reasons, defendant's motions (Docket #s 59, 68 and 70) are DENIED and plaintiff's motion (Docket #58) is GRANTED in part and DENIED in part.[28]

IT IS SO ORDERED.

DATED: February 13, 2008

_____
FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE

---

[28] Additionally, as set forth in footnote 8 <u>supra</u>, plaintiff's motion on liability issues (Docket #64) is GRANTED pursuant to defendant's Concession of Liability, filed Jan. 31, 2008.

32